## The Philadelphia Eagles, Inc. *v.* Department of Revenue.

Argued November 3, 1971, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER and ROGERS.

*Philip P. Kalodner,* for appellant.

*Edward T. Baker,* Deputy Attorney General, for appellee.

OPINION BY JUDGE MENCER, February 7, 1972:

The Philadelphia Eagles, Inc., a New York corporation (Eagles), has filed three separate appeals from the refusal of the Department of Revenue and the Auditor General to resettle the franchise tax and the corporate net income tax of the Eagles for the years 1963 and 1964. Petitions for review of the refusal to resettle were duly filed with the Board of Finance and Revenue which refused said petitions.

More specifically, these three appeals concern the franchise tax for the year 1963, the franchise tax for the period January 1, 1964 to February 3, 1964, and the corporate net income tax for the year 1963, of the Eagles. The appeals to this Court were taken pursuant to Section 1104 of the Fiscal Code of 1929, Act of April 9, 1929, P. L. 343, as amended, 72 P.S. §1104, and our jurisdiction is properly invoked under Section 508(a)(29) of the Appellate Court Jurisdiction Act of 1970, Act of July 31, 1970, P. L. 673, No. 223, 17 P.S. §211.508(a)(29). These appeals were heard by the Court without a jury in accordance with an agreement of the parties entered of record and the provisions of the Act of April 22, 1874, P. L. 109, 12 P.S. §688, et seq. Testimony was taken by the Court without a jury and the case was argued before the Court en banc.

### FINDINGS OF FACT

1. The Philadelphia Eagles, Inc., a New York corporation, within the time provided by law, filed with the Department of Revenue a combined report for franchise tax and corporate net income tax for the calendar year 1963.

2. The corporate net income tax for 1963 was settled in the amount of $27,577.83, as reported and paid by the taxpayer, Eagles.

3. The franchise tax for 1963 was settled in the amount of $25,000, reflecting a capital stock valuation

of $5,000,000, in contrast to the initial paid tax of $5,000 and the Eagles' self-assessed capital stock valuation of $1,000,000.

4. The franchise tax for the period of January 1, 1964, to February 4, 1964, was settled in the amount of $2,328.77, reflecting a capital stock valuation of $5,000,000, in contrast to the initial paid tax of $420 and the Eagles' self-assessed capital stock valuation of $1,000,000.

5. Eagles filed petitions for resettlement of the franchise tax for 1963 and the 34-day period of 1964 and of the corporate net income tax for the year 1963, based upon (a) the use of a taxable proportion allocable to Pennsylvania of 80.6123 percent rather than 100 percent as shown on its original reports and (b) the self-assessed capital stock valuation of $1,000,000.

6. There were no shares of capital stock of Eagles sold in 1963.

7. All the shares of capital stock of Eagles were sold on February 3, 1964, for $5,505,500 cash.

8. The indebtedness of Eagles on February 3, 1964 was zero.

9. The net income of Eagles for the year 1963 was $226,123.

10. The dividend paid by Eagles in the year 1963 was $91,000.

11. The report of Eagles relative to its franchise tax and corporate net income tax for the year 1962 was accepted by the Commonwealth with a capital stock valuation of $1,000,000.

12. The Commonwealth's settlement of the Eagles' franchise tax for 1963 and the 34-day period of 1964 upon a valuation of $5,000,000 was due directly to the sale of Eagles' stock on February 3, 1964 for $5,505,500 cash.

### DISCUSSION

Here we are confronted with the question as to whether or not the valuation placed on the capital stock of the Eagles by the Commonwealth in connection with the reports involved was correct. Eagles reported the value of its capital stock at $1,000,000 but the Commonwealth on the settlement valued the capital stock at $5,000,000.

The Act of June 1, 1889, P. L. 420, §21, as amended, 72 P.S. §1871, levies a franchise tax upon a taxable value of the foreign corporation's capital stock and provides that the actual value of said stock shall be ascertained in the manner prescribed in the twentieth section of the Act, 72 P.S. §1902, which provides that the capital stock shall be valued and appraised "at its actual value in cash as it existed at the close of the year for which report is made; taking into consideration, first, the average which said stock sold for during the year; and second, the price or value indicated or measured by net earnings or by the amount of profit made and either declared in dividends, expended in betterments, or carried into the surplus or sinking fund; and third, the actual value indicated or measured by consideration of the intrinsic value of its tangible property and assets, and of the value of its good will and franchises and privileges, as indicated by the material results of their exercise, taking also into consideration the amount of its indebtedness."

The statute directs that a determination be made of the "actual value in cash" of the capital stock of the corporation. In the instant case the capital stock of Eagles was exchanged for cash in the amount of $5,-505,500 on February 3, 1964, which was the end of the reporting period for the franchise tax covering the 34-day period in 1964. On that date, in the absence of any indebtedness of the corporation, as was the case here,

the actual value in cash was fully determined. It must be remembered that on February 3, 1964, there was no need to attempt to ascertain the actual value in cash since it was ascertained and established by the exchange of the stock for a definite amount of cash. While the statute admonishes us to "[take] into consideration" the three elements: the selling price of the stock during the year, the net earnings or profit and dividends paid, and the intrinsic value of its assets less its indebtedness, the statute nowhere indicates what weight should be put on any of the three elements, but surely they can have no weight in connection with a determination of the actual value in cash of Eagles' stock on February 3, 1964, for on that day Eagles received $5,505,500 in exchange for the stock, and in the absence of indebtedness the "actual value in cash" was ascertained and it existed as the definite sum of money received. However, the Commonwealth upon settlement placed the value at $5,000,000, apparently making an arbitrary but fair allowance for fees and other transfer costs related to the sale of the stock. We will not disturb that value determination by the taxing authorities.

Next we must consider what was the actual value in cash 34 days prior to February 3, 1964, that is, on December 31, 1963, which was the close of the year for which the prior report was made. The Commonwealth contends, understandably so, that the money received for the stock within 34 days of December 31, 1963, is the primary factor in determining the valuation of the stock on that date. In *Commonwealth v. Pomeroy's, Inc.*, 344 Pa. 538, 541, 26 A. 2d 197, 199 (1942), it was stated: "Valuation for capital stock tax purposes is not just a matter of figures and accounting; judgment as to value is required. We repeat what was said in *Com. v. Penna. R. R. Co.*, 297 Pa. 308, 317, 147 A. 242, 'the value of capital stock is not a matter of strict formula

but a matter of judgment. "Common sense and practical every-day business experience are the best guides for those entrusted with the administration of tax laws. Taxation is a practical and not a scientific problem." ' "

In *Commonwealth v. Rosenbloom Finance Corporation,* 91 Dauphin 359 (1969), it was concluded that the different statutory factors for ascertaining valuation of capital stock may receive varying weight, or no weight at all, as the situation of each particular case occasions. See *Commonwealth v. Philadelphia Market Street Subway-Elevated Railway Company,* 408 Pa. 357, 184 A. 2d 483 (1962). In *Rosenbloom,* at page 363, it was stated: "In the instant case the sale price, if the assets were to be sold, should carry great weight because the sale, if held, would be on the valuation date." The primary factor was the high liquidity of the stock in *Rosenbloom* and a recognition that it is proper in arriving at the valuation of capital stock to consider the sale price of all the corporation's assets in a sale occurring after the tax year as was done in *Commonwealth v. Beaver Valley Water Company,* 56 Dauphin 143 (1944).

These considerations are even more relevant and significant here since the sale occurred just 34 days after the taxing year ending December 31, 1963 and because the record discloses that the assets of Eagles on December 31, 1963, were the same as those sold on February 3, 1964. Therefore, where the sale of stock has taken place shortly after the end of the tax year and the assets of the tax year in question are identical to the assets on the date of the sale, the weight to be given to the sale price in determining the actual value in cash of the stock at the end of the tax year is great. The more imminent the sale, the more weight can be given to it. The sale price under such circumstances approximates the "actual value in cash" of the earlier

date and becomes the primary and near controlling factor. The reality of the sale and the consideration actually received are absolutes which simplify the valuation of the stock, encompassing the same assets, as of a slightly earlier date. The valuation of the stock, encompassing the same assets, on two dates, only 34 days apart, results in valuations that are not likely to fluctuate far from the sale price on the later date. The sale price comes close to being the "actual value in cash" as of a date 34 days earlier.

Here we have considered *de novo* all of the matters raised concerning the valuation, keeping in mind that we should take into consideration when determining the "actual value in cash [of the capital stock] as it existed at the close of the year" the three statutory elements set forth in section 20 of the Act of June 1, 1889, as amended, 72 P.S. §1902. We conclude that the element of prime importance here is the receipt of $5,-505,500 in exchange for the capital stock just 34 days after the end of the 1963 taxing year. Therefore, we hold that the Commonwealth properly determined that the actual value in cash of the capital stock of Eagles on December 31, 1963, was $5,000,000, and we will likewise not disturb that value so fixed by the taxing authorities.

Finally, we must on this record decide whether or not Eagles may allocate any of its gross receipts outside the Commonwealth. In the initial tax reports, Eagles did not claim an allocation for any of the apportionment fractions relative to assigning a portion of its gross receipts outside the Commonwealth. Eagles, on its initial tax reports, specifically stated that its only place of business was located in Philadelphia, Pennsylvania and reported a 100 percent taxable proportion allocable to Pennsylvania. There is nothing contained in the record before this Court to overcome

Eagles' initial position that it was not transacting business outside Pennsylvania and did not maintain an office outside of Pennsylvania during the tax periods in question. Eagles offered no testimony to the contrary. Here Eagles contends that, by its attempt to file amended reports showing a taxable proportion of 80.-6123 percent, combined with filing petitions for resettlement in which the same revised taxable proportion was made in part the basis for the petitions, and in the absence of evidence indicating that their amended taxable proportion is incorrect, its amended taxable proportion should be accepted by and become binding upon the Commonwealth. We cannot agree with this contention, since we held in *Commonwealth v. Stretchnit, Inc.,* 2 Pa. Commonwealth Ct. 270, 273 A. 2d 750 (1971), that the corporate taxpayer has the burden of establishing sufficient facts to show it is entitled to the use of the apportionment fractions claimed. Here there are no facts in the record to meet that burden, and amended reports and allegations in petitions for resettlement, by themselves, are not sufficient to entitle Eagles to use the 80.6123 percent apportionment fractions which it now belatedly claims it should be permitted to use.

Accordingly, we make the following

CONCLUSIONS OF LAW

1. In appraising the value of the capital stock of the Philadelphia Eagles, Inc., a New York corporation, for franchise tax purposes for the year 1963 and a portion of the year 1964, the Commonwealth properly valued such capital stock at $5,000,000.

2. The taxpayer, Philadelphia Eagles, Inc., a New York corporation, has not sustained its burden of proof to use other than the 100 percent apportionment fraction relative to gross receipts.

3. The Commonwealth properly settled the 1963 franchise tax of the Philadelphia Eagles, Inc., a New York corporation, at $25,000.

4. The Commonwealth properly settled the 1964 franchise tax of the Philadelphia Eagles, Inc., a New York corporation, at $2,328.77.

5. The Commonwealth properly settled the 1963 corporate net income tax of the Philadelphia Eagles, Inc., a New York corporation, at $27,577.83.

### ORDER

AND NOW, this 7th day of February, 1972, these three appeals are dismissed and judgments are directed to be entered in favor of the Commonwealth of Pennsylvania and against Philadelphia Eagles, Inc., at No. 608 Transfer Docket 1970 in the amount of $25,000.00; at No. 609 Transfer Docket 1970 in the amount of $2,328.77; at No. 610 Transfer Docket 1970 in the amount of $27,577.83, unless exceptions be filed hereto within thirty (30) days of the receipt of a copy of this order. The Philadelphia Eagles, Inc., having paid the amount of each judgment, it is directed that each judgment shall be marked satisfied upon the payment of costs.